**In re HENNEPIN COUNTY 1986
RECYCLING BOND
LITIGATION.**

Nos. C0–93–2251, C4–93–2253
and C6–93–2254.

Supreme Court of Minnesota.

Nov. 9, 1995.

William Z. Pentelovitch, David F. Herr, Susan D. Holappa, Minneapolis, for Hennepin County.

Allen W. Hinderaker, Cecilia M. Michel, Denise M. Ellis, Minneapolis, for Hennepin Energy Resource Co.

Richard Voelbel, Jeff Ross, Thomas Darden, Robert Levy Jon Hopeman, Ann Sanford, Karl Cambronne, Stuart Bear, Minneapolis, Mark Reinhardt, Gavin Wilkinson, St. Paul, for respondent.

Hubert H. Humphrey, III, Attorney General, Christie B. Eller, Assistant Attorney General, St. Paul, for Amicus Curiae, State of Minnesota.

Richard H. Martin, Robyn Hansen, Gregory Poe, Minneapolis, for Amici Curiae, City of St. Paul, City of Minneapolis, Metropolitan Council, Minneapolis Community Development Agency, the Association of Minnesota Counties and the Minnesota County Attorneys' Association.

## OPINION

STRINGER, Justice.

This class action arose when defendants Hennepin County (County) and Hennepin Energy Resource Co., Limited Partnership (HERC) (collectively, defendants) triggered mandatory redemption of over $124,000,000 in revenue bonds by declining to seek renewal of a Letter of Credit backing the bonds. We granted review to determine whether plaintiff bondholders (hereinafter, bondholders) properly stated claims for breach of express and implied contract provisions in bond agreements between the bondholders and defendants. We conclude that the bondholders' claims for breach of express and implied contract provisions are sufficient to withstand defendants' motions to dismiss pursuant to Minn.R.Civ.P. 12.02(e). Accordingly, we affirm in part and reverse in part the decision of the court of appeals, and

remand for further proceedings in accordance with this opinion.

On October 1, 1986, the County issued $129,250,000 in tax-exempt, long-term revenue bonds known as the Hennepin County Solid Waste Resource Recovery Refunding Revenue Bonds Series 1986A (recycling bonds) to finance construction of a solid waste disposal and resource recovery facility near downtown Minneapolis. Defendant HERC (also referred to as Company in the Loan Agreement), a limited partnership, contracted with the County to own, construct, and operate the recycling facility. An underwriting syndicate purchased and offered the bonds to the public pursuant to an Official Statement on October 1, 1986.

The County issued the recycling bonds pursuant to several documents including the bond certificates, the Official Statement, a Loan Agreement between the County and HERC, and a Trust Indenture between the County and the Trustee. The Loan Agreement and Trust Indenture were entered into simultaneously on October 1, 1986 (collectively, bond agreements), and the bond certificates expressly incorporate these agreements.

The recycling bonds were secured by a Letter of Credit issued by Banque Indosuez and Credit Lyonnais (banks) on October 8, 1986, scheduled to expire on October 15, 1992.

The bonds matured on various dates between 1995 and 2010, but the Trust Indenture and the Official Statement gave the County the right to redeem the bonds before maturity upon payment of a two percent premium if redemption occurred on October 1, 1996, the earliest date redemption could occur. Premium payments scaled down one-half percent each year thereafter until October 1, 2000, the first date the bonds could be redeemed without the County paying a premium to the bondholders. The bonds had a triple-A credit rating.

On December 20, 1989, HERC sold the recycling facility to the United States Trust Company of New York (USTC) and simultaneously leased back the facility pursuant to a lease agreement (Lease Agreement). At the same time, the County, HERC, and USTC entered into the County Assumption, Assignment and Amendment Agreement (Assumption Agreement), consenting to the terms of the Lease Agreement.

On January 7, 1992, the County's financial advisor, noting a dramatic decline in market interest rates, recommended that the County refinance its obligations with respect to the recycling facility by permitting the Letter of Credit to expire and issuing new, lower interest-rate bonds. On July 31, 1992, apparently persuaded that this was a prudent course of action, the County notified the banks that it would not approve an extension of or a replacement for the existing Letter of Credit. On approximately September 8, 1992, the County permitted the Letter of Credit to expire, an event triggering mandatory redemption of the bonds pursuant to Section 4.07 of the Loan Agreement and Section 3.01(e) of the Trust Indenture. The Trustee thereupon sent the bondholders a Notice of Redemption with an effective date of October 9, 1992.

By October 9, 1992, the bondholders had surrendered their bonds and the County redeemed them at par plus interest through October 9, 1992. No premium was paid. The Letter of Credit backing the bonds expired on October 15, 1992.

In the fall of 1992, the bondholders filed three separate class action complaints against defendants. A consolidated, amended class action complaint was filed in April 1993, alleging breach of contract, breach of an implied covenant of good faith and fair dealing, various fraud and securities claims, and seeking future interest and premiums lost as a result of the redemption.

Both defendants filed motions to dismiss pursuant to Minn.R.Civ.P. 12.02(e), with respect to the breach of contract claims and the claims for breach of an implied covenant of good faith and fair dealing. Defendants also asserted several procedural bases for dismissal, including lack of subject matter jurisdiction, and moved to dismiss the securities and fraud claims. The procedural claims and the securities and fraud claims are not before the court on this appeal.

The district court concluded that the bond agreements imposed no express duty upon defendants to seek renewal of the Letter of Credit. The district court also found that although HERC agreed to use "best efforts to renew or extend" the Letter of Credit in the Lease Agreement of December 20, 1989, HERC contracted with USTC, not with the bondholders, and the Lease Agreement was not identified as an amendment to the bond agreements. Accordingly, the district court concluded that the Lease Agreement did not amend the bond agreements and declined to construe clauses in the Lease Agreement for the benefit of the bondholders. The district court dismissed the bondholders' express breach of contract claims, but permitted the bondholders to maintain their claims for breach of an implied covenant of good faith and fair dealing.[1]

Both the bondholders and defendants appealed. The County challenged the court's subject matter jurisdiction, and both the County and HERC challenged whether the bondholders properly stated a claim for breach of an implied covenant of good faith and fair dealing. The bondholders challenged whether the district court erred in dismissing their express contract claims.

Reversing the district court's resolution of the motions to dismiss, the court of appeals held that the bond agreements were ambiguous with respect to defendants' duties concerning renewal of the Letter of Credit, and with respect to whether defendants' conduct constituted a breach of those duties. *In re Hennepin County 1986 Recycling Bond Litigation*, 517 N.W.2d 63, 67 (Minn.App.1994). The court further held that the 1989 Lease Agreement effectively amended the earlier Loan Agreement because, according to the court of appeals, the "best efforts" provision of the Lease Agreement became an operational part of the bond agreements, thus defining HERC's duties. *Id.* at 68. The

court of appeals declined to reach the implied covenant issue. *Id.* This appeal followed.[2]

■ The bondholders urge us to review this case as an appeal from summary judgment rather than an appeal from a dismissal pursuant to Minn.R.Civ.P. 12.02(e) because they provided the district court with an expert affidavit. Generally, the court may not consider extrinsic evidence on a motion to dismiss pursuant to Minn.R.Civ.P. 12.02(e). Rule 12.02 provides: "If, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment * * *." Consistent with Rule 12.02, the district court did not consider in its order the expert affidavit and other matters extraneous to the pleading offered by the bondholders, and thus was not required to treat the motion as one for summary judgment.

■ The bondholders also contend that the dismissal should have been treated as summary judgment because the district court considered the bond agreements in their entirety, rather than merely the provisions cited in the bondholders' amended complaint. In deciding a motion to dismiss, however, the court may consider the entire written contract when the complaint refers to the contract and the contract is central to the claims alleged. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *Teagardener v. Republic–Franklin Inc. Pension Plan*, 909 F.2d 947, 949–50 (6th Cir.1990), *cert. denied*, 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991). Accordingly, we review this matter as an appeal from a dismissal pursuant to Minn.R.Civ.P. 12.02(e).

We turn first to the question whether the bondholders stated a claim upon which relief can be granted relating to their allegations of

---

1. The court also declined to entertain the bondholders' motion for declaratory judgment. *See Culligan Soft Water Serv. of Inglewood, Inc. v. Culligan Int'l Co.*, 288 N.W.2d 213, 215–16 (Minn.1979); *see also Twin City Fed. Sav. and Loan Ass'n v. Gelhar*, 525 F.Supp. 802, 804 (D.Minn.1981), *aff'd*, 681 F.2d 528 (1982).

2. The State of Minnesota, the City of St. Paul, the City of Minneapolis, the Metropolitan Council, the Minneapolis Community Development Agency, the Association of Minnesota Counties, and the Minnesota County Attorneys' Association filed briefs as *amici curiae*.

express breach of the bond agreements. Resolution of this question turns on whether the language of the bond agreements explicitly permitted the County to voluntarily trigger mandatory redemption of the bonds by declining to seek renewal of the Letter of Credit, or whether the language is ambiguous, permitting an interpretation that the County did not have the right to voluntarily invoke the mandatory redemption provisions.

■ We affirm the court of appeals' holding that the language of the bond agreements was ambiguous. *In re Hennepin County,* 517 N.W.2d at 67. A bond is a contract, and a determination of "when bonds are callable for payment should be made from the recitals in the instruments themselves." 15 Eugene McQuillin, *The Law of Municipal Corporations* § 43.117 (3d ed. 1995); *Connell v. Bauer,* 240 Minn. 280, 291, 61 N.W.2d 177, 184 (1953). Thus, resolution of this issue turns on simple and well established principles of contract interpretation.

■ Whether a contract is ambiguous is a question of law for the court. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979). The court generally does not consider extrinsic evidence when determining contractual ambiguity, and we abide by that general rule here. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982); *Instrumentation Servs. v. General Resource Corp.,* 283 N.W.2d 902, 908 (Minn.1979). A contract is ambiguous if it is susceptible of more than one construction. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349, 354 (Minn.1979); *Employers Liab. Assurance Corp. v. Morse,* 261 Minn. 259, 264, 111 N.W.2d 620, 624 (1961).

The Loan Agreement and Trust Indenture entered in October 1986 contain several interrelated provisions relevant to this issue:

● Section 4.06 of the Loan Agreement pertains to optional prepayment of the loan. The fourth paragraph of Section 4.06 provides as follows:

In addition to the option granted by this Section to the Company to prepay the loan by optional redemption of Series 1986 Bonds, the County shall have the right of optional redemption of Series 1986 Bonds with the consent of the Company, if and to the extent that moneys are on deposit in the Redemption Fund and are available for the redemption of Series 1986 Bonds pursuant to paragraph (d) or (e) of Section 5.06 of the Indenture.[3] Except for moneys deposited and available pursuant to paragraph (d) or (e) of Section 5.06 of the Indenture *and for mandatory redemption of Bonds at the times and in the circumstances provided for in Section 3.01 of the Indenture,* Series 1986 Bonds shall be called for redemption by the County only upon the direction of the Company.

(Emphasis added.)

● Section 3.01 of the Trust Indenture pertains to redemption of the bonds. Section 3.01(a) sets forth the *optional* right to prepay the bonds prior to maturity but at a premium to the County until October 1, 2000. Sections 3.01(b), (c), (e), and (f) set forth the circumstances pursuant to which the bonds are subject to *mandatory* redemption, for example, if the bonds lose their tax exempt status, if the project is condemned, or upon maturation of the bonds.[4] Specifically, Section 3.01(e) of the Trust Indenture provides:

The Series 1986 bonds are subject to mandatory redemption in whole, but not in part, at par plus accrued interest, upon the occurrence of any of the events specified in paragraph (a), (b), (c), (d), (e) or (f) of Section 4.07 of the Loan Agreement, upon the terms and conditions prescribed in said Section 4.07 of the Loan Agreement.

● Section 4.07 of the Loan Agreement provides in part:

[T]he Series 1986 Bonds are subject to mandatory redemption, and the Company

---

**3.** Section 5.06 of the Trust Indenture establishes the Redemption Fund.

**4.** Section 3.01(g) specifies that the bonds are subject to "extraordinary optional redemption" in the event of damage to or destruction of the recycling facility.

shall prepay the loan, upon the occurrence of any of the following events:

   \*    \*    \*    \*    \*    \*

(f) *The Company or the Banks shall not have furnished to the Trustee extension of the expiry date in [a] form satisfactory to the Trustee or issuance and acceptance of a Substitute Letter of Credit or other Alternate Credit Facility complying with the provisions of Section 12.04 of the Indenture at least 45 days prior to the expiry date of the Letter of Credit or Alternate Credit Facility then held by the Trustee.*

(Emphasis added.)[5]

- Section 6.13 of the Loan Agreement pertains to renewal of the Letter of Credit. In pertinent part Section 6.13 states:

In the event that the Banks offer to renew the Letter of Credit, *the acceptance of such offer shall require the agreement of both the County and the Company.* \* \* \* \* In the event that the Letter of Credit is not renewed and that the Term Loan, as defined in the Reimbursement Agreement, is not available, the County and the Company shall agree upon alternative financing. The provisions of this Section 6.13 shall survive the payment of the Series 1986 Bonds.

(Emphasis added.)

■ Before we analyze the provisions of the bond agreements to determine whether there is an ambiguity with respect to defendants' duties regarding mandatory redemption of the bonds through the failure of the Letter of Credit, we must deal with the effect of Section 8.09 of the Loan Agreement on the rights and obligations of the parties. Section 8.09 of the Loan Agreement provides:

This Loan Agreement is executed in part to induce the purchase by others of Bonds and Notes to be issued by the County, and accordingly all covenants and agreements on the part of the Company and the County as set forth in this Loan Agreement are hereby declared to be for the benefit of the Holders from time to time of the Bonds and Notes and the Banks in respect of Advances not repaid.

The court of appeals concluded that Section 8.09 of the Loan Agreement required defendants "to consider the bondholders' best interests, and not [their] own," when deciding whether to renew the Letter of Credit. *In re Hennepin County,* 517 N.W.2d at 67. We disagree with the court of appeals' interpretation of Section 8.09.

■ The rights of third-party beneficiaries "depend upon, and are measured by, the terms of the contract." *Brix v. General Accident & Assurance Corp.,* 254 Minn. 21, 24, 93 N.W.2d 542, 544 (1958); Restatement (Second) of Contracts § 309 cmt. b (1981) (stating that a third-party beneficiary's rights are subject to limitations in the contract). Section 8.09 of the Loan Agreement does not establish a separate or additional duty of care; rather, it merely establishes that the bondholders are entitled, as third-party beneficiaries, to enforce existing covenants in the bond agreements.

To introduce the powerful abstraction of "fiduciary duty" into the highly negotiated and exhaustively documented commercial relationship between an issuer of convertible securities and the holders of such securities would \* \* \* risk greater insecurity and uncertainty than could be justified by the occasional increment in fairness that might be hoped for.

*Simons v. Cogan,* 542 A.2d 785, 791 (Del.Ch. 1987), *aff'd,* 549 A.2d 300 (Del.1988). Further, the conclusion of the court of appeals

---

5. In addition, the Trust Indenture, § 2.01B, provides:

    In the event that the Initial Letter of Credit is not renewed and an Alternate Credit Facility is not issued and accepted by the Trustee at the time and in compliance with the conditions specified in Section 12.04 hereof, the County shall refund the Series 1986 Bonds which have been called for redemption in accordance with the provisions of Section 3.01(e) hereof and Section 4.07(f) of the Loan Agreement by the issuance of its Term Loan Notes \* \* \* issued in accordance with Section 3 of the Reimbursement Agreement.

Section 12.04 provides that if the Trustee accepts a Substitute Letter of Credit there will be no mandatory redemption. *See* Trust Indenture, § 12.04. However, Section 12.04 proceeds to outline circumstances pursuant to which the Trustee *shall* accept a Substitute Letter of Credit. *Id.*

could result in precluding any redemption, even with a premium payment, if the bonds considered for redemption had a higher yield than would be available in the current bond market. We do not read Section 8.09 of the Loan Agreement so broadly and hold that Section 8.09 of the Loan Agreement is a statement of the rights of the bondholders, as third-party beneficiaries, to enforce the provisions of the bond agreements.

■ We now turn to the question whether the bond agreement provisions set forth above are ambiguous with respect to defendants' duties regarding mandatory redemption of the bonds as a result of defendants' thwarting renewal of the Letter of Credit. The court of appeals held that the bond agreements are ambiguous with respect to whether the parties intended to provide the County with discretion to trigger mandatory redemption of the bonds at its option. We agree. When the relevant provisions in the bond agreements are read as a whole, considering the relative placement of the redemption provisions, it is unclear whether the bond agreements permit the County to voluntarily trigger mandatory redemption of the bonds.

Specifically, Section 3.01(a) of the Trust Indenture provides that the bonds are redeemable "at the option of the County" beginning in 1996 and pursuant to the terms of the redemption schedule. The redemption schedule provides for a significant premium to be paid by the County in exchange for exercising its right to redeem the bonds prior to their maturity. On the other hand, Sections 3.01(b), (c), (e), and (f) of the Trust Indenture set forth the circumstances pursuant to which *mandatory* redemption shall occur.[6] The optional redemption provisions are an allocation of financial risk, but the mandatory redemption provisions are for an entirely different purpose. The mandatory redemption provisions are for the protection of the bondholders in the event of some unforeseen happening that would jeopardize the investment value of the bonds.

It is relevant to note a United States District Court's view of the importance of such protective provisions:

> [T]he significant fact which accounts in part for the detailed protective provisions of the typical long-term debt financing instrument, is that the lender (the purchaser of the debt security) can expect only interest at the prescribed rate plus the eventual return of the principle. Except for possible increases in the market value of the debt security because of changes in interest rates, the debt security will seldom be worth more than the lender paid for it * * * It may, of course, become worth much less. *Accordingly, the typical investor in a long-term debt security is primarily interested in every reasonable assurance that the principal and interest will be paid when due.* * * * Short of bankruptcy, the debt security holder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he * * * establishes his rights through contractual provisions set forth in the debt agreement or indenture.

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1518 (S.D.N.Y.1989) (emphasis altered) (quoting American Bar Foundation, *Commentaries on Indentures* 1–2 (1971)). Thus, the structure and placement of the mandatory redemption provisions suggest they were not to be invoked voluntarily, but were intended for the protection of the bondholders in the event of some unforeseen event that put the value of the bondholders' investment at risk.

In effect, when the County intentionally foreclosed extension of the Letter of Credit, it opted to redeem the bonds. Because the bonds were redeemed "at the option of the County," it is arguable at the very least, that the County must comply with Section 3.01(a) of the Trust Indenture requiring the payment of a premium for the right to redeem the bonds prior to maturity. Logically, one must ask why the parties would have painstakingly negotiated an economic risk alloca-

---

**6.** An "extraordinary optional redemption" is provided for in Section 3.01(g) in the event of damage or destruction of the recycling facility.

tion in the bond agreements, permitting the County to redeem at its option prior to the October 1, 2000, maturity if it were willing to pay a premium to do so, but simultaneously permitting the County to redeem at the expiration of the Letter of Credit, without a premium penalty, simply by blocking renewal or extension of the Letter of Credit.

Our conclusion is consistent with our opinion in *Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443 (Minn.1980), where this court addressed the issue of whether a party to a contract could avoid performance by affirmatively blocking the happening of a condition precedent. We held that it could not. " '[A] party who has entered into an obligation to pay will not be permitted to set up his own voluntary default to defeat the same, unless such intention clearly and unequivocally appears' in the contract." *Id.* at 449 (quoting *Dana v. St. Paul Inv. Co.*, 42 Minn. 194, 195, 44 N.W. 55, 55 (1889)).

Further, as the court of appeals observed, Section 4.07 of the Loan Agreement provides for mandatory redemption if "[t]he *Company or the Banks* shall not have furnished to the Trustee extension * * * [of the Letter of Credit]." *In re Hennepin County*, 517 N.W.2d at 65 (emphasis added). The plain language of Section 4.07 suggests that if an option to renew the Letter of Credit exists, as the County contends, it belongs to HERC and to the banks, not to the County.[7]

On the record before us on this appeal from a Rule 12 dismissal, we conclude that the bond agreements are at least ambiguous as to whether the County can, in effect, turn a shield intended for the bondholders' protection into a sword for the County, permitting redemption of the bonds before maturity without payment of a premium. Consequently, we hold that the bondholders stated a claim upon which relief could be granted regarding the express breach of contract claim against the County.

The dissent simply fails to see the actions of the County here for what they are: the intentional obstruction of the issuance of the renewed Letter of Credit to obtain a premium-free redemption, nine years before maturity and four years before the optional right to redeem for a premium accrued. This is nothing more than an optional redemption, for which there is ample instruction in the bond agreements as to when, how, and at what price it can occur, masquerading as a mandatory redemption. We believe the dissent's reading may seriously distort the intention of the parties in their rights and responsibilities, *inter se*, and for this reason have concluded that the right of the County to trigger redemption is ambiguous.

Because the court of appeals held that the 1989 Lease Agreement and Assumption Agreement amended the earlier bond agreements, we briefly address this issue for purposes of providing guidance to the trial court in considering this matter on remand.[8]

In 1989, HERC executed a sale and leaseback of the recycling facility to USTC pursuant to the Lease Agreement. In Section 13.13 of the 1989 Lease Agreement the parties agreed as follows:

[T]he Lessor and the Lessee shall use their *reasonable best efforts* whenever required to procure a renewal or extension of the Letter of Credit or the issuance of an Alternate Credit Facility on a timely basis prior to the expiration of the Letter of

---

7. We reject the County's argument that Section 6.13 of the Loan Agreement accords them complete discretion in deciding whether to renew the Letter of Credit.

Section 6.13 of the Loan Agreement requires the agreement of both the County and HERC prior to acceptance of a renewed letter of credit. Read in context of the surrounding provisions, Section 6.13 appears to require defendants to ensure that any renewal or extension of the Letter of Credit complies with certain financial requirements. For example, Section 6.12 describes the requirements for Replacement Credit Enhancement pursuant to the terms of Section

12.04 of the Trust Indenture, and the remainder of Section 6.13 describes the requirements for alternative financing. Arguably, Section 6.13 imposes an obligation upon defendants to ensure that the terms of the renewed or extended Letter of Credit are sufficient to protect the bondholders' investment.

8. Defendants contend that the bondholders did not assert the Lease was incorporated into the bond agreements. However, the bondholders did plead the connection between Section 13.13 of the Lease Agreement and the bond agreements in their Amended Class Action Complaint.

Credit or any Alternate Credit Facility then in effect.

(Emphasis added.)

The County simultaneously executed the Assumption Agreement, recognizing the Lease Agreement between HERC and USTC. In addition, Section 3.1(d) of the Assumption Agreement grants USTC certain rights regarding prepayment of the Loan, to the exclusion of HERC:

[T]he Owner Trustee shall have the sole right, to the exclusion of the Company (*but subject to the provisions of Section 13.13 of the Lease, to which the parties hereto hereby consent* ), (i) to prepay the County Loan and require redemption of the Bonds pursuant to and in accordance with the provisions of Section 4.06 of the Original Loan Agreement, (ii) to consent to or direct redemption of the Bonds by the County in accordance with the provisions of such Section, * * * (v) to agree to any renewal of the Letter of Credit, to make a borrowing of the Term Loan or to furnish or agree to an alternative financing in accordance with Section 6.13 of the Original Loan Agreement.

(Emphasis added.)

The district court observed that the Lease Agreement was not identified in any way as an amendment to the original bond agreements, and that the bondholders were not third-party beneficiaries of the 1989 agreements because the agreements were among HERC, the County, and USTC. Thus, there was no reason to construe Section 13.13 of the Lease Agreement for the benefit of the bondholders.

The court of appeals reversed, holding that Section 13.13 of the 1989 Lease Agreement amended HERC's duties with respect to the original Loan Agreement. *In re Hennepin County,* 517 N.W.2d at 68 ("Because the parties expressly consented to [the "reasonable best efforts"] language in the Amended Loan Agreement, this provision became an operational part of the bond agreements and, therefore, defines HERC's duties.").

We disagree with the court of appeals. First, HERC's obligation to use its "reasonable best efforts" under Section 13.13 of the Lease Agreement to procure a renewal of the Letter of Credit is owed exclusively to the Owner Trustee, USTC, not the bondholders. *See Buchman Plumbing Co. v. Regents of the Univ. of Minn.,* 298 Minn. 328, 215 N.W.2d 479 (1974). Moreover, under Section 3.1(d) of the Assumption Agreement USTC assumed the sole right, to the exclusion of HERC, to decide whether to consent to renewal of the Letter of Credit pursuant to Section 6.13 of the original Loan Agreement. Thus, USTC's decision to seek renewal of the Letter of Credit under Section 6.13 was a condition precedent that never occurred to HERC's obligation to use its "reasonable best efforts" under Section 13.13 of the Lease Agreement.

Second, the definition of the term "Bond Documents" in the Lease Agreement does not refer to the Lease Agreement itself, nor does Article IV of the Assumption Agreement, entitled "Amendments to Original Loan Agreement," incorporate Section 13.13 of the Lease Agreement. Accordingly, we conclude that the 1989 agreements do not amend the original bond agreements to impose a duty upon defendants to seek renewal of the Letter of Credit on behalf of the bondholders.

Finally, we consider whether the bondholders stated claims for breach of an implied covenant of good faith and fair dealing.[9] Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not "unjustifiably hinder" the other party's performance of the contract. *Zobel & Dahl Constr. v. Crotty,* 356 N.W.2d 42, 45 (Minn. 1984); *see also Haase v. Stokely–Van Camp, Inc.,* 257 Minn. 7, 13, 99 N.W.2d 898, 902 (1959); Restatement (Second) of Contracts § 205 (1981). Similarly, we have held that the party to a contract cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition. *Space Center,* 298 N.W.2d at 449; *Nodland v. Chirpich,* 307

9. In Minnesota, appellate courts may review any order involving the merits or affecting the judgment of a case before the court. Minn.R.Civ. App.P. 103.04.

Minn. 360, 366–67, 240 N.W.2d 513, 516 (Minn.1976).

In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract. Here, however, the bondholders' implied covenant claims are based on the underlying bond agreements. To allege an implied covenant claim the bondholders need not first establish an express breach of contract claim—indeed, a claim for breach of an implied covenant of good faith and fair dealing implicitly assumes that the parties did not expressly articulate the covenant allegedly breached. *Metropolitan Life,* 716 F.Supp. at 1516. Here, the bondholders properly stated a claim for breach of an implied covenant of good faith and fair dealing, and accordingly, we affirm the district court on this issue.

Affirmed in part, reversed in part, and remanded for further proceedings.

COYNE, Justice (dissenting).

I respectfully dissent. To be sure, the Official Statement, the Indenture, the Loan Agreement, and the other documents to which reference is made are distinctly tough to read, as is the documentation involved in similar types of investments. But reading difficulty is not the same as ambiguity, and like the district court judge, I see nothing ambiguous about the provisions dealing with the expiration of the Letter of Credit and the mandatory redemption of the bonds on termination of the Letter of Credit unless an Alternate Credit Facility has been provided.

Printed in all capital letters on the face page of the Official Statement issued by HERC[1] is the following description of the bonds:

THE SERIES 1986A BONDS ARE LIMITED OBLIGATIONS OF THE COUNTY, PAYABLE SOLELY FROM THE SOURCES SPECIFIED IN THE INDENTURE REFERRED TO HEREIN. THE SERIES 1986A BONDS AND

PREMIUM, IF ANY, AND INTEREST THEREON DO NOT CONSTITUTE AN INDEBTEDNESS OF THE COUNTY WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND DO NOT CONSTITUTE OR GIVE RISE TO A CHARGE AGAINST THE COUNTY'S GENERAL CREDIT OR TAXING POWER. IN ADDITION, THE OBLIGATIONS OF THE PARTNERSHIP UNDER THE LOAN AGREEMENT REFERRED TO HEREIN ARE PAYABLE ONLY FROM THE PARTNERSHIP AND PARTNERSHIP INCOME AND ASSETS AND ARE NONRECOURSE AGAINST BLOUNT ENERGY RESOURCE CORP., OTHER PARTNERS OF THE PARTNERSHIP AND BLOUNT, INC.

The face page also describes the Letter of Credit and the effect of its termination:

Payment of principal of the Series 1986 Bonds when due at the stated maturities thereof, upon acceleration or mandatory redemption, and interest accrued thereon will be payable from the proceeds of an irrevocable, direct-pay Letter of Credit, as described herein, to be issued simultaneously with delivery of the Series 1986A Bonds by the New York Branches of

CREDIT LYONNAIS and
BANQUE INDOSUEZ

obligating each bank, jointly and severally, to pay an amount equal to the principal of and up to 240 days' interest on the outstanding Series 1986 Bonds. *The Letter of Credit expires on October 15, 1992, unless earlier terminated in accordance with its terms. If the Letter of Credit is not extended and an Alternate Credit Facility is not provided, all outstanding Series 1986 Bonds will be subject to mandatory redemption upon the termination of the Letter of Credit.* (Emphasis supplied.)

1. Because the majority opinion has chosen to identify defendant Hennepin Energy Resource Co. Limited Partnership by its initials HERC, it will continue to be identified as HERC in this dissenting opinion. However, in the Official Statement Hennepin Energy Resource Co. is called the "Partnership" and in the Loan Agreement and the Indenture it is called the "Company."

The above-quoted paragraphs from the face or cover page of the Official Statement unmistakably inform even a casual reader that the Series 1986A Bonds do not constitute or give rise to a charge against Hennepin County's general credit or its taxing power. Furthermore, HERC's obligation to make payment is limited to its assets and income. No recourse can be had against either its general or other (limited) partners or against Blount, Inc., the parent of HERC's general partner. These severe limitations on sources of payment of the obligation of the bonds clearly inform a prospective investor that, without some further assurance of payment, the bonds issued to permit the construction and operation of a mass burn solid waste disposal facility unique and unproven in the United States constitute a high risk investment.

The further assurance of payment which justifies Moody's "Aaa" rating is found in the provision for a Letter of Credit. The above-quoted paragraph informs prospective investors that simultaneously with the issuance of the 1986A Bonds Credit Lyonnais and Banque Indosuez will issue a direct-pay Letter of Credit irrevocably binding each of them jointly and severally to payment of the principal and accrued interest on the bonds when due at their various stated maturities or upon acceleration or mandatory redemption. The prospective investor is then unequivocally and unambiguously informed that unless it has already terminated according to its terms, the Letter of Credit expires on October 15, 1992, and unless it has been extended or replaced by an Alternate Credit Facility "all outstanding Series 1986 Bonds will be subject to mandatory redemption upon the termination of the Letter of Credit." In short, the prospective investors were notified that the safety net which assured bondholders of the security of their investment would expire on October 15, 1992. At that time either the bonds must be redeemed or some action must be taken to furnish a new safety net.

Redemption of the bonds is discussed at some length in the body of the Official Statement. Following a section entitled *Notice and Effect of Redemption* is a section entitled *Optional Redemption* which advises the prospective bondholder of the price (including a premium) of redemption of some bonds at the option of the County with HERC's consent (but the County's option is limited to a redemption which does not exceed the amount of money on deposit in the Redemption Fund) or by the County acting on HERC's request to redeem all or part of the bonds with moneys to be deposited by HERC with the Trustee, such options being exercisable on October 1, 1996 and thereafter. The next section, entitled *Extraordinary Optional Redemption*, advises that if the Facility is damaged so that it cannot be efficiently operated, the bonds could be redeemed at the option of the County and HERC by payment of principal and accrued interest. The Statement warns that the Letter of Credit does not secure such a redemption. The next six sections deal with mandatory redemption: *(1) Mandatory Redemption from Unused Proceeds, (2) Mandatory Redemption in 36 Months If Necessary To Preserve Tax Exemption, (3) Mandatory Sinking Fund Redemption, (4) Mandatory Redemption upon Expiration of Letter of Credit or Alternate Credit Facility, (5) Mandatory Redemption upon Certain Events Relating to Construction, Acceptance or Operation of the Facility, and (6) Mandatory Redemption upon Condemnation of the Facility.* The section entitled *Mandatory Redemption upon Expiration of Letter of Credit or Alternate Credit Facility* provides as follows:

If 45 days before the stated expiration date of the extant Letter of Credit or any Alternate Credit Facility the Partnership or the Banks have not furnished to the Trustee evidence satisfactory to it of the extension of the expiration date of the extant Letter of Credit or the issuance of an Alternate Credit Facility complying with the provisions of the Indenture, all Outstanding Series 1986A Bonds are subject to mandatory redemption on a date occurring not less than five days prior to such expiration date, at a redemption price equal to the principal amount thereof plus interest accrued to the redemption date. The Letter of Credit has a stated expiration date of

October 15, 1992. (See "ALTERNATE CREDIT FACILITY.")

Once again the prospective bondholder is put on notice that the Letter of Credit expires on October 15, 1992, and that unless the Trustee has received evidence satisfactory to it of either the extension of the extant Letter of Credit or the issuance of an Alternate Credit Facility at least 45 days before the expiration date, all of the Series 1986A Bonds are subject to mandatory redemption not later than 5 days before the expiration date. Then the reader of the Statement is directed to the section entitled ALTERNATE CREDIT FACILITY which expressly provides that any Substitute Letter of Credit or Alternate Credit Facility must be approved by the County as well as HERC and Blount.

If the terms which might result in termination of the Letter of Credit prior to October 15, 1992 were of interest to a prospective bondholder, the form of the Letter of Credit to be issued on issuance of the bonds was appended to the Official Statement as Exhibit C. Finally, the Official Statement informs the prospective bondholder that, on request, the County will furnish copies of the Loan Agreement, the Indenture, and other documents referred to in the Statement.

The Loan Agreement provides at Sections 2.01 and 2.02 for issuance of the Series 1986A Bonds, the disposition of the bond proceeds, the title to the Project building and equipment (see also Section 3.09), HERC's agreement to operate the Facility on its completion, and to repay the loan in an amount sufficient to pay the bonds, together with interest and premium (if any) thereon.[2]

Article IV of the Loan Agreement is entitled LOAN PAYMENTS AND DEPOSITS. Section 4.01 sets out the County's agreement to lend the bond proceeds to HERC. Section 4.02 deals with HERC's obligation to repay the loan and describes required payments to the Bond Fund, to the Sinking Fund, to the Reserve Fund, and to the Redemption Fund. Section 4.03 provides for certain additional payments by HERC, and Section 4.04 provides that HERC's obligations pursuant to the agreement are abso-

lute and unconditional and that HERC may not assert a claim of set-off except that it has the right to set off against loan repayments any service fee or adjusted service fee due and payable from the County, but only if it has furnished security satisfactory to the County when the service fee is disputed. Section 4.05 specifies the amount of interest payable by HERC on any delinquent installment of loan repayment.

Section 4.06 grants HERC the option to prepay the loan and require the County to redeem the bonds "at the times and prices and in the circumstances provided for optional redemption in Section 3.01(a) of the Indenture." The balance of Section 4.06 requires HERC to give written notice to the County and the Trustee at least 121 days prior to the date on which prepayment is to be made and within the same time period to pay to the Trustee for deposit in the Redemption Fund an amount sufficient to redeem all or such part of the outstanding bonds as HERC specifies. In addition, Section 4.06 accords the County a right of optional redemption "with the consent of [HERC]," if and only to the extent there is money in the Redemption Fund available for redemption pursuant to paragraph (d) or (e) of Section 5.06 of the Indenture. That the exercise of the County's option is not only subject to HERC's consent but that the option is available only in very limited circumstances is confirmed by the succeeding sentence of Section 4.06:

> Except for moneys deposited and available pursuant to paragraph (d) or (e) of Section 5.06 of the Indenture and for mandatory redemption of Bonds at the time and in the circumstances provided for in Section 3.01 of the Indenture, Series 1986 Bonds shall be called for redemption by the County only upon the direction of the Company [*i.e.*, HERC].

Since Article IV is entitled LOAN PAYMENTS AND DEPOSITS, it is not too surprising that the following section, Section 4.07, deals with mandatory redemption:

> In addition to mandatory redemption under Section 3.01(b), Section 3.01(c), Section

---

2. This oversimplified description of the promises to lend and to repay is intended only as a re-

minder of the nature of the 73–page loan agreement between Hennepin County and HERC.

3.01(d) and Section 3.01(f) of the Indenture * * * the Series 1986 Bonds are subject to mandatory redemption, and the Company shall prepay the loan, upon the occurrence of any of the following events:

(a) * * * *

Clauses (a) through (e) of Section 4.07 which have been omitted from the above quotation all describe events which precipitate mandatory redemption. In summary form, these clauses invoke mandatory redemption for the following reasons:

(a) if certain conditions specified in Sections 2.01 and 2.02 of the Service Agreement between the County and HERC, such as securing all government permits and licenses necessary for construction and provision by HERC of construction bonds and insurance as required by the agreement are not satisfied prior to the Contingency Termination Date (January 1, 1988 unless extended with the consent of the issuers of the Letter of Credit); or

(b) if the conditions specified in Section 4.04(a) of the Indenture for disbursement of funds from the Construction Account have not been met by the Contingency Termination Date; or

(c) if the County has not accepted the Project by February 1, 1991 unless the date has been extended by the County and HERC pursuant to the Service Agreement; or

(d) in the event of permanent shutdown of the Facility as the result of an act or omission on the part of either HERC or the County in breach of the Service Agreement; or

(e) in the event of permanent shutdown of the Facility as a result of a change in the law.

The precipitating event at issue in this case is described at clause (f) of Section 4.07 in these words:

(f) *The Company or the Banks shall not have furnished to the Trustee extension of the expiry date in form satisfactory to the Trustee or issuance and acceptance of a Substitute Letter of Credit or other Alter-nate Credit Facility complying with the provisions of Section 12.04 of the Indenture at least 45 days prior to the expiry date of the Letter of Credit or Alternate Credit Facility then held by the Trustee.* (Emphasis supplied.)

Although the Loan Agreement does not obligate the County to deliver to the Trustee an extension or new Letter of Credit or other Alternate Credit Facility, the Agreement does provide that unless either HERC or the issuing banks furnish an extension or new Letter of Credit or other Alternate Credit Facility at least 45 days prior to the expiration date of the current Letter of Credit, the bonds are subject to mandatory redemption. There is no dispute that neither HERC nor the Banks submitted such an instrument to the Trustee prior to September 1, 1992. But although the Loan Agreement does not require the County to submit the replacement bondholder safety net to the Trustee on expiration of the Letter of Credit, at Section 6.13 the agreement does require, contrary to the plaintiffs' allegation that renewal or replacement of the Letter of Credit depended solely on the option of the issuing banks, "not at the option of HERC or the County," and equally contrary to the majority's declaration that "if an option to renew the letter of credit exists, * * * it belongs to HERC and to the Banks, not to the County," that in the event the Banks offer to renew the Letter of Credit, *both the County and HERC must agree to acceptance of the offer.* Moreover, the form of any renewal had to be satisfactory to the Trustee.

If, as the majority contends, the option to renew the Letter of Credit "belongs to HERC and to the Banks, not to the County," the County was not in a position to frustrate issuance of a renewal or new Letter of Credit. It is undisputed, however, that neither HERC nor the Banks furnished to the Trustee an extension or renewal or substitute Letter of Credit.

Now it is indeed true that the "option" to offer to renew the Letter of Credit or not to offer to renew belongs to the Banks. Neither HERC nor the County had any right to require the Banks to extend or renew the Letter of Credit. But the Banks' "option" is

not an option to renew or extend, in the legal sense; the Banks have not acquired by payment of consideration a right to demand that the Letter of Credit be renewed. The Banks simply have the right to offer or decline to offer to renew the Letter of Credit; in order for renewal of the Letter of Credit to actually take place, the Banks must offer to renew and the offer must be accepted by *both* the County and HERC. The Loan Agreement provision with respect to renewal, Section 6.13, is quite straightforward:

> In the event that the Banks offer to renew the Letter of Credit, the acceptance of such offer shall require the agreement of both the County and the Company.

    \*     \*     \*     \*     \*     \*

Having rejected out of hand the plain language of Section 6.13 which requires the agreement of both the County and HERC for acceptance of an offer to renew the Letter of Credit, the majority leaps to the remarkable conclusion that Section 6.13 imposes on the County and HERC the obligation "to ensure that the terms of the renewed or extended Letter of Credit are sufficient to protect the bondholders' investment."

In an earlier footnote the majority had cited Section 12.04 of the Indenture as providing that the Trustee can prevent mandatory redemption by accepting a substitute Letter of Credit. The footnote went on to state "Section 12.04 proceeds to outline circumstances pursuant to which the Trustee *shall* accept a Substitute Letter of Credit." (Emphasis supplied in majority opinion.)

If the majority's footnotes are intended to indicate that the Trustee can cut off mandatory redemption by accepting a Substitute Letter of Credit to which either HERC or the County or both refuse to consent, the majority simply disregards the basic element of contract law. A Letter of Credit is a contract; a contract requires the making of an offer by one party to the contract and the acceptance of that offer by the other party to the contract. The bond documents contemplate an offer by the Banks, which agree to provide funds when called upon following the occurrence of certain events and acceptance of that offer by HERC and the County, the parties responsible for payment of the sizea-

ble consideration for the Banks' undertaking. Although the Indenture places on the Trustee the duty to draw on the Letter of Credit on the happening of one of several specified events, the Trustee is not a party to the Letter of Credit and is not authorized to accept an offer of a Letter of Credit on behalf of either HERC or the County.

As to the implication that Section 12.04 mandates acceptance of a proffered Substitute Letter of Credit, the majority fails to mention that Section 12.04 provides that the Trustee shall accept the Substitute Letter of Credit only *if* seven conditions, many of which depend upon the opinion of bond counsel, are all met to the Trustee's satisfaction.

In short, the majority's view of the import of Section 6.13 of the Loan Agreement and Section 12.04 of the Indenture has no basis in the documents themselves. To say, as does the majority, that the "bond agreements" are ambiguous with respect to the effect of expiration of the Letter of Credit and to deprive the County and HERC of their contractual right to reject any renewal offer from the Banks is not only to rewrite the Loan Agreement; but it is also to impose on the County and HERC the obligation " 'to consider the bondholders' best interests, and not [their] own,' when deciding whether to renew the letter of credit," the same obligation which the court of appeals imposed on the County—the obligation which the majority says it rejects.

In my view the court of appeals' interpretation of the declaration at Section 8.09 of the Loan Agreement that the bondholders were third-party beneficiaries of the covenants and agreements in the Loan Agreement to require the County "to consider the bondholders' best interests, and not its own" amounts to a shocking disregard of the primary obligation of county commissioners—their obligation to the taxpayers of the County. Moreover, even absent the commissioners' duty to their constituents, the idea that when parties engage in what each supposes is an arm's length transaction, one party is required to subvert his own interests and advance the interests of the other party is to stand both the law and commerce on their

respective heads. Accordingly, I am in full accord with the majority's expressed rejection of the court of appeals' interpretation of Section 8.09. I am, however, at a loss to understand how the majority managed to arrive at the same result.

The Indenture, a form of mortgage given by the County to First Trust Company, Inc., as Trustee, sets out a description of the form, maturities, interest rates, and numeration of the Series 1986 Bonds at Section 2.01A. Section 2.01B provides that in the event the Initial Letter of Credit is not renewed and an Alternate Credit Facility is not issued and accepted by the Trustee, "the County shall refund the Series 1986 Bonds which have been called for redemption in accordance with the provisions of Section 3.01(e) hereof and Section 4.07(f) of the Loan Agreement."

Article III of the Indenture, *Redemption of Bonds*, sets out the circumstances under which the Series 1986 Bonds are subject to redemption prior to maturity, the terms on which the bonds are to be redeemed, and the duties of the Trustee, the County and HERC with respect to any redemption. Section 3.01, *Redemption of Series 1986 Bonds*, provides as follows:

The Series 1986 Bonds shall be subject to redemption prior to maturity only as follows:

\*    \*    \*    \*    \*    \*

Clause (a) of Section 3.01 provides that the Series 1986A Bonds maturing after October 1, 1996 are subject to redemption in whole or in part at the option of the County with HERC's consent if, and to the extent that, money is available in the Redemption Fund pursuant to paragraph (d) or (e) of Section 5.06 of the Indenture or at the option of the County acting at the request of HERC pursuant to HERC's option granted by Section 4.06 of the Loan Agreement. Clause (a) goes on to specify the redemption dates and the amount of premium to be paid on such redemption.

Clauses (b) through (f) of Section 3.01 set out the various circumstances under which the bonds are subject to mandatory redemption: In summary form these clauses invoke mandatory redemption for the following reasons:

(b) If and to the extent the bond proceeds have not been expended within 36 months of the date of issue unless the Trustee is advised by Bond Counsel that failure to redeem does not affect the federal income tax exemption of interest on the bonds.

(c) In the event of condemnation of the Project.

(d) The Series 1986A Bonds maturing in 2006 are subject to redemption beginning in 2002 and those maturing in 2010 are subject to redemption beginning in 2007 at par plus accrued interest by application of money held in the Sinking Fund.

(e) Clause (e) follows verbatim:

The series 1986 Bonds are subject to mandatory redemption in whole, but not in part, at par plus accrued interest, upon the occurrence of any of the events specified in paragraph (a), (b), (c), (d), (e) or (f) of Section 4.07 of the Loan Agreement, upon the terms and conditions prescribed in said Section 4.07 of the Loan Agreement.

(f) The Series 1986A Bonds maturing in 1995 through 2001 are subject to mandatory redemption, in part, on the next interest payment date at least 90 days after the Completion Date, from the unexpended funds remaining in the Construction Account.

(g) Provides for extraordinary optional redemption in the event of certain kinds of damage to or destruction of the Facility.

To be sure, the foregoing excerpts and discussion of the information disclosed in the 33–page Official Statement and the various pertinent provisions of the 73–page Loan Agreement and 133–page Indenture make neither scintillating nor titillating reading. The excerpts do, however, demonstrate that all three documents are, like others of their kind, well and carefully drafted but interrelated and exceedingly complex. Their length and complexity may explain why—in all probability—few, if any, bondholders have ever read them. It is obvious, however, from a review of the quoted portions of the Official

Statement, the Loan Agreement, and the Indenture that a prospective bondholder is apprised four times in perfectly plain and understandable language that the Letter of Credit issued contemporaneously with issuance of the Series 1986A Bonds would expire no later than October 15, 1992 and that unless that Letter of Credit was extended or replaced by a new Letter of Credit or some Alternate Credit Facility the bonds would be redeemed at par plus accrued interest.[3] The language of the documents varies somewhat to meet the purpose of the particular document: While the Official Statement is intended to provide the information material to the reader's decision whether to become a bondholder, the Loan Agreement spells out the rights and duties of the County and HERC inter se, and the Indenture governs the rights and duties of the Trustee and the County. The majority characterizes the optional redemption provision as "an allocation of financial risk," while declaring that mandatory redemption is for the protection of the bondholders "in the event of some unforeseen happening that would jeopardize the investment value of the bonds." That pronouncement is wrong on two counts: First, optional redemption has nothing to do with allocation of financial *risk;* there is *no* financial *risk* in redemption. Optional redemption has to do only with the profitability of the bonds. Second, there can be no doubt that mandatory redemption protects the bondholders on the occurrence of an event that jeopardizes the investment value of the bonds—an event that alters the *financial risk*—but there is absolutely nothing in any of the bond documents that limits the invocation of mandatory redemption to "some unforeseen happening." Of the various bases for mandatory redemption, condemnation

and permanent shutdown as a result of change in the law are not events which are expected to occur, but they are events whose occurrence has been foreseen and provision for mandatory redemption made in the event of occurrence. Although damage to or destruction of the Facility may be both unforeseen and beyond the control of the parties, it does not precipitate mandatory redemption but only extraordinary optional redemption. The other bases of mandatory redemption are either scheduled to occur at a specified time or they are or probably are within the control of one or more of the parties. In my opinion a specified event which is within the control of one or more of the parties to a transaction can hardly qualify as an "unforeseen happening." Some of the parties may prefer that it not happen, but that does not make it unforeseen—merely unwelcome. The provision with respect to the expiration of the Letter of Credit is unique: expiration of the letter during the life of the Series 1986A Bonds can hardly be characterized as unforeseen. Bondholders are repeatedly advised that if not sooner terminated, the Letter of Credit *will* expire on October 15, 1992. Its expiration without extension, renewal, or replacement by either a substitute Letter of Credit or Alternate Credit Facility may or may not be within the control of either HERC or the County. It may be that in 1992, for reasons not apparent when the bonds were issued in 1986, no qualified bank is willing to offer a Letter of Credit and no Alternate Credit Facility is available. Or it may be that the terms of an offer are unacceptable to the County and HERC, or it may simply be that either the County or HERC, for reasons of its own, chooses to reject any offer.[4] Nothing in either the Loan Agree-

---

3. Inasmuch as only a single clause of the Indenture deals with optional redemption—clause (a) of Section 3.01—while five clauses deal with mandatory redemption—clauses (b) through (f) of Section 3.01, one of which—clause (e)—incorporates the six additional bases for mandatory redemption set out at Section 4.07 of the Loan Agreement, there seems to me no justification for the majority's assumption that a bondholder is entitled to utterly ignore the description of the ten events which invoke mandatory redemption and to read only the provision for optional redemption and extraordinary optional redemption and, by ignoring the provisions for mandatory

redemption, complain that any exercise by the County or HERC of their clearly stated contractual rights constitutes an express breach of contract and/or a breach of an implied covenant of good faith and fair dealing.

4. The necessity for acceptance, if it occurs at all, will occur within a predictable and limited period of time. Unless a decrease in interest rates sufficient to justify refunding the bonds coincided with the time for acceptance or rejection of the banks' offer of a new Letter of Credit, acceptance would lock the County and HERC into the exist-

ment or the Indenture requires the County or HERC to justify or even to identify the reason for rejection. It is enough that the documents protect the safety of the bondholders' investment, and by triggering mandatory redemption the documents do just that. The financial risk has been allocated in toto to the Banks which issued the Letter of Credit, for the Indenture provides that if the Trustee has not received a new Letter of Credit or Alternate Credit Facility acceptable to the Trustee 45 days prior to the expiration date of the current Letter, the Trustee must draw on the Letter of Credit funds sufficient for payment of the principal and accrued interest. The Trustee and the Banks performed in accordance with their respective undertakings, and on October 9, 1992, 6 days before the expiry date of the Letter of Credit, the Series 1986 Bonds were redeemed at par plus interest to October 9, 1992. As the plaintiffs concede, they delivered their bonds for redemption and they were paid and accepted payment of the par value of their bonds, together with interest to October 9, 1992. In short, the plaintiffs have recovered their complete investment, together with interest to the redemption date. Their complaint is not that they lost all or even part of their principal investment but only that they did not make as much profit as they had hoped to make. Of course, they have had the use of the funds since October 9, 1992 and may have since invested them with sizeable success.

The following observation by the United States District Court for the Southern District of New York, quoted by the majority in support of their mistaken notion that "the structure and placement of the mandatory redemption provisions suggest they were not to be invoked voluntarily, but were intended for the protection of the bondholders in the event of some unforeseen event that put the value of the bondholders' investment at risk" is instructive:

> [T]he significant fact, *which accounts in part for the detailed protective provisions of the typical long-term debt financing instrument,* is that *the lender (the purchaser of the debt security) can expect only interest at the prescribed rate plus the eventual return of the principal.* Except for possible increases in the market value of the debt security because of changes in interest rates, the debt security will seldom be worth more than the lender paid for it. * * * It may, of course, become worth much less. Accordingly, the typical investor in a long-term debt security is primarily interested in every reasonable assurance that the principal and interest will be paid when due. * * * Short of bankruptcy, *the debt security holder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he * * * establishes his rights through contractual provisions set forth in the debt agreement or indenture.*

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1518 (S.D.N.Y.1989) (emphasis added by *Metropolitan Life* court) (quoting American Bar Foundation, *Commentaries on Indentures,* 1–2 (1971)).

In *Metropolitan Life,* generally known as the *MetLife* case, the bondholders complained that RJR Nabisco had, by entering into a leveraged buy-out, undertaken an enormous new debt which jeopardized its ability to repay the bonds and drastically impaired the security for the bonds. Because some of the bonds had been purchased only 3 months before RJR Nabisco's CEO proposed the leveraged buy-out, it seems unlikely that the new debt was "unforeseen" by RJR Nabisco when those bonds were purchased. The complaints of the *MetLife* bondholders paralleled those of the plaintiffs in the present case. Rejecting their claim that the bond documents were ambiguous and that RJR Nabisco had violated an implied covenant of good faith, the court had this to say about the language of typical bond documentation, what the court called the "customary, or boilerplate, provisions" of detailed indentures used and relied on throughout the security market:

> '[B]oilerplate provisions are * * * not the consequences of the relationship of particular borrowers and lenders and do not depend upon particularized inten-

ing bond requirements until expiration of the new Letter of Credit.

tions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact. Moreover, uniformity in interpretation is important to the efficiency of capital markets. * * * Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. * * * Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.'

[Quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir.1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983) ]; *see also Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529, 1535–36 (S.D.N.Y.1983) (Sand, J.) ("Plaintiff concedes that the legality of [the transaction at issue] would depend on a factual inquiry. * * * This case-by-case approach is problematic. * * * [Plaintiff's theory] appears keyed to the subjective expectations of the bondholders * * * and reads a subjective element into what presumably should be an objective determination based on the language appearing in the bond agreement.").

*MetLife*, 716 F.Supp. at 1515–16.

The *MetLife* court concluded that the indenture at issue there addressed the eventuality of a merger and that although no explicit provision either permitted or prohibited a leveraged buy-out, "such contractual silence itself cannot create ambiguity." *Id.* at 1515. Pointing out that RJR Nabisco had not breached its contractual obligation to make periodic and regular payments of interest and that there was no reason to believe that the principal would not be paid when it became due, the court concluded that the indenture did not include an implied covenant

that would prevent incurring new debt to facilitate the leveraged buy-out and that "there [was] no implied covenant restricting any action that might subject plaintiffs' investment to greater risk of non-payment." *Id.* at 1519 n. 24.

No doubt the huge increase in RJR Nabisco's debt attendant upon the leveraged buy-out gave the *MetLife* bondholders cause for their concern about the safety of their investment. Not so for the Series 1986 bondholders who are the plaintiffs here. The investment of these plaintiffs has been repaid in full, with interest to October 9, 1992, when redemption took place. Had the Trustee failed to draw timely on the Letter of Credit, jeopardizing the ability of the County and HERC to redeem the bonds, I have not the least doubt the plaintiffs would be before us with a legitimate complaint—that the County and HERC had breached their mandatory obligation to redeem the bonds not less than 5 days prior to the expiration of the Letter of Credit.

That the subjective expectations of the bondholders do not convert clearly stated bond provisions into ambiguities is forcefully demonstrated by the holding in *Lucas v. Florida Power & Light Co.*, 765 F.2d 1039 (11th Cir.1985). *Lucas*, one of the class of plaintiff-bondholders, complained that Florida Power & Light Co. (FPL) had been vague, omissive, and obscure regarding the susceptibility of FPL first mortgage bonds issued on March 13, 1975 to replacement fund redemption, causing a widespread market belief that the bonds were nonredeemable until March 1, 1980. The interest rate on this $125 million bond issue was 10⅛ percent, the highest ever paid by FPL. The opening paragraph of the prospectus given prospective bondholders had this to say about redemption:

The New Bonds will be redeemable, in whole or in part, upon not less than 30 days' notice at the general redemption prices and, under certain circumstances, at the special redemption prices as described herein, provided that, prior to March 1, 1980, no redemption may be made at a general redemption price through refunding at an effective interest cost to the

Company of less than 10.052% per annum. *Such limitation does not, however, apply to redemptions at a special redemption price for the replacement fund or with certain deposited cash or proceeds of released property. The special redemption prices for the New Bonds are 101.67% of the principal amount through February 29, 1976 and decrease thereafter to 100% for the twelve months ending February 28, 2005. See "New Bonds—Redemption and Purchase of Bonds" herein.*

*Id.* 765 F.2d at 1041 (emphasis supplied by *Lucas* court).

The replacement fund to which the prospectus refers was created by a provision in FPL's original 1944 mortgage, which required FPL to spend a certain sum each year for the maintenance and replacement of the mortgaged property or for the redemption of bonds. Any deficiency in the expenditures for maintenance and replacement was to be made up by the deposit of cash in the maintenance and replacement fund. The replacement fund had, for all practical purposes, never been used to redeem bonds; but in March 1977, just about 2 years after issuance of the bonds, FPL announced that it was considering refinancing $63.7 million of 10 1/8 percent bonds due March 1, 2005 at a special redemption price of 101.65. *Id.* at 1042.

The bondholders complained that they had been led to believe that the bonds could not be refunded at an effective interest cost of less than 10.052 percent before March 1, 1980, and then only at a price of 109.76. In essence, the bondholders contended that omissions and misstatements in the prospectus did not provide an investor with the information essential for evaluation of the vulnerability of the bonds to redemption through the replacement fund, especially during the 5–year period of refunding protection. In particular, the bondholders cited FPL's failure to disclose the size of the 1974 deficiency ($54 million) which FPL was required to deposit in the replacement fund.

Initially, it was held that the above-quoted first paragraph of the prospectus made it clear that prior to March 1, 1980, "the bonds were, simply stated, *nonrefundable* [5] for 5 years after issuance." *Id.* at 1041.

The trial court ruled that the prospectus did not contain misrepresentations or omissions, then went on to say this:

> The likelihood at the time of issue that FPL would later redeem some or all of the bonds at a special redemption price was unknown and unknowable and, therefore, not a material fact.

*Id.* at 1045.

Affirming judgment in favor of FPL, the circuit court stated:

> The *possibility* of a special redemption was clear on the face of the prospectus; the *vulnerability* or likelihood of such a redemption was a matter of speculation at the time.

*Id.* (emphasis in original).

Similarly in the present case the expiration date of the Letter of Credit and the *possibility* of mandatory redemption for lack of a renewal or replacement safety net were clear on the face of the Official Statement; and the *vulnerability* or likelihood of such a mandatory redemption was a matter of speculation at the time. In 1986 when these bonds were issued economists and financial experts were of two minds about the future of interest rates; some were of the opinion that interest rates would rise but others opined a future decrease in interest rates. In all probability, however, even the experts would concede that prognostication about the course of interest rates 6 years later—in 1992—would be nothing more than speculation. It seems to me unlikely that Hennepin County had any clearer vision of the 1992 interest rates than did either the experts or the bondholders. Consequently, I consider the implication that the County and HERC set a hidden-redemption-option-without-premium trap for unwary investors completely unjustified.

---

**5.** In a footnote the *Lucas* court pointed out that the terms "nonrefundable," "nonredeemable," and "noncallable" were often used loosely and that the almost interchangeable use may have contributed to investor misunderstanding. The court then pointed out that "refunding" means a sale of bonds to redeem an earlier series of bonds. *Id.* at 1041 n. 7.

In any case, even the most unsophisticated investor could not fail to understand that if interest rates dropped sufficiently in the early months of 1992 to justify the cost of refinancing the bonds, neither the County nor HERC would be likely to consider a proposal for or even an offer of a new Letter of Credit acceptable and that if a replacement Letter of Credit or Alternate Credit Facility were not delivered to the Trustee at least 45 days prior to October 15, 1992, or if the Trustee were not satisfied that the new Letter of Credit or Alternate Credit Facility submitted to it met all the requirements of the Indenture, the bonds would be redeemed on or before October 10, 1992. In fact, the bonds were redeemed, and the plaintiffs here concede that their bonds were redeemed by payment of their full face value plus accrued interest. In short, the bondholders did not lose any money; they just did not profit quite as handsomely as they had hoped.

Finally, I do not understand that Minnesota has ever recognized a cause of action for breach of an implied covenant of good faith and fair dealing independent of an underlying breach of contract claim. If a party proves breach of an express term of the contract, there is, of course, no reason to reach the question whether there has been a breach of an implied covenant. Therefore, it may be more appropriate to say that breach of an implied covenant is actionable *only* if the implied covenant will only aid and further the express terms of the contract and "will never impose an obligation 'which would be inconsistent with other terms of the contractual relationship.'" *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. at 1517.

> With respect to contracts like indentures—
> "[A]n implied covenant ... derives its substance directly from the language of the Indenture, and 'cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture.' *[Where]* plaintiffs' contractual rights [have not been] violated, there can have been no breach of an implied covenant." [Emphasis added in original].

*Id.* at 1517 (citing *Gardner & Florence Call Cowles Foundation v. Empire Inc.,* 589

F.Supp. 669, 673 (S.D.N.Y.1984), *vacated on procedural grounds,* 754 F.2d 478 (2d Cir. 1985) quoting *Broad v. Rockwell,* 642 F.2d 929, 957 (5th Cir.) *(en banc),* cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)).

Here the County did not violate the bondholders' rights when it exercised its own contractual right to reject the Banks' offer to renew the Letter of Credit if the Banks made such an offer. Accordingly, the bondholders have not stated a claim of breach of implied covenant upon which relief can be granted, and on that issue, on which the court of appeals did not rule, I would reverse the trial court and, since there has been no breach of an express term of the contract, dismiss any claim of breach of implied covenant of good faith and fair dealing, which the plaintiffs concede they did not plead as a separate claim.

In conclusion I am obliged to reiterate my observation that the Official Statement, the Loan Agreement, and the Indenture are typical bond documents—well crafted but lengthy and extremely complex. Complex documents are, of course, attractive targets for contrived complaints of ambiguity. If, however, the order in which the numbered sections appear in the Loan Agreement and the Indenture executed in connection with the issuance of the Series 1986 Bonds can be said to create an ambiguity and if the plain language of the provisions governing the Letter of Credit and Redemption—whether mandatory or optional or extraordinary optional—can be declared ambiguous, then all bond documents are ambiguous and subject to whatever subjective expectations any reader wishes to impress upon them. Like the United States Court of Appeals for the Second Circuit, which sits at the heartland of this nation's financial market, I regard uniformity of interpretation and application of the customary provisions of detailed documents used and relied on throughout the securities market as essential to the operation of capital markets. To treat standardized language as ambiguous in order to achieve a desired result seems to me commercially, as well as legally, unsound. As

the Second Circuit Court of Appeals put it in the *Sharon Steel Corp.* case—

> Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets.

691 F.2d at 1048.

I fear this decision sounds the death knell of the Minnesota municipal bond market, for it requires a municipality either to issue bonds, the terms of which will be unknown until some judge decides how the ambiguous bond documents will be interpreted or to issue bonds callable at will—a choice which is unlikely to appeal either to issuers or purchasers and which may well have a depressing effect on the market value of such bonds. The majority wishes to characterize the requirement that any offer to renew the Letter of Credit be accepted by both the County and HERC as the equivalent of a provision making the Series 1986 Bonds "callable at will." In fact the opportunity to accept or reject an offer to renew the Letter of Credit or to issue a new Letter of Credit could arise only during a limited period of time just before September 1, 1992—from whenever the Banks chose to make an offer to August 31, 1992. Of course, we do not know if the Banks made an offer, but if they had and if the County and HERC had accepted that offer, then neither the County nor HERC could have triggered mandatory redemption by rejecting a proffered Letter of Credit until the expiry date of the Letter of Credit issued in 1992.

For the foregoing reasons I would reverse the court of appeals and direct the entry of judgment in favor of the County of Hennepin and Hennepin Energy Resource Co. Limited Partnership.

KEITH, Chief Justice (dissenting).

I join in the dissent of Justice COYNE.

PAGE, Justice (dissenting).

I join in the dissent of Justice COYNE.