Steven **CODDON**, as Personal Representative of the Estate of Myrna Coddon, Appellant,

v.

Galen **YOUNGKRANTZ**, et al., Defendants and Third-Party Plaintiffs, Respondents,

v.

Steven **CODDON**, as Personal Representative of the Estate of Myrna Coddon, Counter-Claim Defendant and Third-Party Defendant, Appellant,

Steven Coddon, Counter–Claim Defendant and Third–Party Defendant.

No. C5–96–2180.

Court of Appeals of Minnesota.

April 22, 1997.

Review Denied July 10, 1997.

---

Dennis W. Hagstrom, Svingen, Athens, Russell & Hagstrom, P.L.L.P., Fergus Falls, for appellant.

Nathan L. Seeger, Nathan Seeger Law Office, Fergus Falls, for respondents.

Considered and decided by PARKER, P.J., TOUSSAINT, C.J., and HUSPENI, J.

## OPINION

PARKER, Judge.

The trial court entered judgment in favor of respondent, cancelling the parties' contract for deed. We reverse and remand.

## FACTS

Appellant Myrna Coddon[1] purchased the Country Manor Mobile Home Park located in Fergus Falls, Minnesota, by a contract for deed from respondents Galen and Patricia Youngkrantz[2] on October 29, 1993. The purchase price of the property was $330,000; the terms were a $30,000 downpayment and the balance financed by the seller at nine percent with monthly payments of $2,699.18 for 20 years, due on the 15th of each month.

The property was mortgaged with Credit America for $290,000, and Youngkrantz remained responsible for the mortgage payments of $1,457.57 due on the 20th of each month. Although not a written term of the parties' contract, Coddon was instructed by Youngkrantz to send contract payments directly to Credit America. Credit America then applied the payment to Youngkrantz's monthly mortgage payment and deposited the balance in the Youngkrantz account. Contract payments were due on the 15th to allow time to apply them to the mortgage payments, due on the 20th.

Occasionally, Coddon's contract payments were late. This resulted in Youngkrantz either incurring a late fee from Credit America or making the mortgage payment himself in order to avoid late charges. Whenever Coddon submitted a payment late, he included a daily interest amount of nine percent of the monthly principal for the number of days the payment was late. This was not a term of the contract but was the custom of the parties. The amount of daily interest was $.14.

Coddon's June 1996 payment was not received by Credit America on June 15, and Youngkrantz initiated this cancellation proceeding by serving Coddon with statutory notice on June 28, 1996. The notice of cancellation informed Coddon of the following two items of default:

> Failure to make the payment due on June 15, 1996 in the amount of $2,699.18. To cure said default we must also receive interest at the rate of 9% on the principle [sic] amount of $570.51, which is $.14 per day until we have payment in hand.[3]

Coddon was also required, by statute, to pay $53.98, which represented two percent of the amount in default at the time of service. *See* Minn.Stat. § 559.21, subd. 3 (1996).

At the time Coddon was served with the notice, he had already mailed his June payment to Credit America, but it had not yet been received and negotiated. He had also mailed a money order for $1.82 directly to Youngkrantz for daily interest, but erroneously calculated the amount at $.13 per day instead of $.14. On the evening of June 28, Coddon immediately mailed a check to

---

1. Throughout these proceedings, Myrna Coddon's husband, Steve Coddon, acted as her attorney-in-fact. Myrna Coddon is now deceased, and Steve Coddon is personal representative for the estate. When referring to Coddon in this opinion, we mean Steve Coddon unless otherwise noted.

2. This opinion will refer to Youngkrantz in the singular to mean both of the respondents and will usually mean Galen Youngkrantz particularly because he was the party who acted on behalf of respondents throughout these proceedings.

3. The notice also informed Coddon that he would need to pay the cost of service of the notice according to the statute, but that amount was not indicated.

Youngkrantz for $54.12, which included the $53.98 statutory penalty and $.14, the $.01 difference in daily interest payments for the 14 days the payment was late. After sending the additional $54.12 check, Coddon acted on the presumption that he had complied with all items of default in the cancellation notice.

Contrary to the parties' custom, the notice of cancellation instructed that payments be made directly to Youngkrantz. Nevertheless, Coddon mailed the July payment to Credit America on July 8, believing that he had already cured any default and was back to making regular payments. Credit America received and negotiated the July payment on July 10. Also on July 10, Youngkrantz returned to Coddon the June payment, uncashed by Credit America, the $1.82 money order, and the check for $54.12. Youngkrantz's letter informed Coddon, "All checks to satisfy this cancellation must be made payable to us directly." [4]

On July 12, Coddon issued a new check to Youngkrantz for the June payment and mailed that payment along with the same interest check and money order that Youngkrantz had previously returned. Youngkrantz accepted and negotiated the June payment. On August 15, Coddon received notice that the cost of serving the cancellation was $59; Coddon paid that fee on August 17. On August 22, Coddon mailed his August payment to Credit America. Pursuant to Youngkrantz's instructions, Credit America returned Coddon's uncashed August payment to him on August 26. That same day, Coddon issued and mailed another check for August made out to Youngkrantz. Youngkrantz did not receive payment before the August 27 expiration of the statutory 60-day redemption period. Youngkrantz did receive the August payment by certified mail on August 29, which Youngkrantz refused and returned to Coddon.

Youngkrantz then considered the contract cancelled. He entered the mobile home park on August 30, informed Coddon's manager that Coddon no longer owned the property, and ordered the manager to forward all rents and receipts to Youngkrantz. Youngkrantz also proceeded to inspect the property and to break locks.

Coddon filed a complaint in district court seeking injunctive relief, seeking to quiet title and establish his interest as the contract vendee, seeking damages for trespass, and seeking "other and further relief as may be just." After a court trial, judgment was entered in favor of Youngkrantz, cancelling the contract for deed and giving him all right in the property.

## ISSUE

I. Does the evidence support the trial court's conclusion that Coddon defaulted on the contract for deed?

II. Did the trial court have jurisdiction to consider Coddon's defenses and claims for equitable relief?

## ANALYSIS

### I.

Default is the threshold requirement that allows a vendor to invoke statutory cancellation of a contract for deed. Cancellation by notice is allowed

> if a default occurs in the conditions of a contract for the conveyance of real estate * * * that gives the seller a right to terminate it * * *.

Minn.Stat. § 559.21, subd. 2a (1996). Only a material breach or a substantial failure in performance gives the seller a right to terminate a contract for deed. *Miller v. Snedeker,* 257 Minn. 204, 219, 101 N.W.2d 213, 224–25 (1960). The relevant facts of this case are not in dispute. Applying undisputed facts to the parties' contract presents a question of law that we review de novo. *See Lakeview Terrace Homeowners Ass'n v. Le Rivage, Inc.,* 498 N.W.2d 68, 72 (Minn.App.1993) (construction and legal effect of a contract is a question of law, reviewed by an appellate court without deference to the trial court).

Although the contract for deed defined default as the untimely performance of

---

4. Youngkrantz did not explain why he returned the money order and interest checks that *were sent to him directly.* Presumably, they lacked the additional $.14 per day interest that was still mounting because the June payment was not negotiated but instead was sent back to Coddon.

the terms of the contract, delay in a single installment payment is not the type of material breach or substantial failure of performance that cancels a contract for deed. The rights of a purchaser under a contract for deed are "not forfeited merely by delinquency in making an installment payment." *Tarpy v. Nowicki*, 286 Minn. 257, 262, 175 N.W.2d 443, 447 (1970). Further, interpreting default to mean literally a single untimely payment would result in Coddon forfeiting his downpayment, all subsequent payments, all capital improvements, and would relieve Youngkrantz of his agreement to convey the property. We do not construe the contract to reach such an inequitable or absurd result. *See Chergosky v. Crosstown Bell, Inc.*, 463, N.W.2d 522, 526 (Minn.1990) (contracts are interpreted to give their provisions meaning and effect; construction that leads to an absurd result should be avoided).

■ The notice of cancellation relied on Coddon's failure to make his June payment as a default justifying cancellation.[5] Subsequently, Youngkrantz accepted and negotiated Coddon's June payment. Nevertheless, the trial court ruled that Coddon defaulted by failing to make his July and August payments. The trial court's finding that Coddon failed to make the July payment is contrary to the evidence and clearly erroneous. Coddon followed the parties' custom by mailing his July payment to Credit America, in this case, earlier than usual. In spite of these undisputed facts, the trial court found that Coddon failed to make his July payment because he did not mail it to Youngkrantz. The trial court found the July payment sent to Credit America

> was not yet due, was not paid to an entity and place designated by Youngkrantz under the notice of cancellation, was placed beyond the full control of Youngkrantz, and is therefore treated as a prepayment under the contract for deed.

This finding is not supported by the contract. Payment to Credit America could not be a prepayment under the contract if Coddon

had not assumed the Credit America mortgage.

■ Coddon's act of mailing the July payment to Credit America was, at worst, a misunderstanding. The cancellation notice specified only the June payment to be in default. Although the notice required

> [a]ny additional payments becoming due under the contract to the seller after this notice was served on you be paid to the person authorized by this notice to receive payment,

this language is ambiguous as applied to Coddon. He had already mailed his June payment; it was not returned to him until after he mailed his July payment and, at the time he mailed his July payment, he believed he was no longer in default.

■ The trial court also ruled that Coddon defaulted on his August payment. While the August payment was mailed late, it was nevertheless mailed to Credit America, as was the parties' custom, on August 22. This seven-day delay in making a single installment payment can not be the basis of default. *Tarpy*, 286 Minn. at 262, 175 N.W.2d at 447. In addition, Youngkrantz's act of refusing payment appears to be an attempt to create a default, violating the implied covenant of good faith and fair dealing that was part of the parties' contract. *In re Hennepin County 1986 Recycling Bond Litigation*, 540 N.W.2d 494, (Minn.1995) (every contract includes implied covenant of good faith and fair dealing). Youngkrantz cannot benefit from a default he helped create. *See Craigmile v. Sorenson*, 248 Minn. 286, 291, 80 N.W.2d 45, 49 (1956) (vendors of contract for deed must exercise their rights in good faith; where they act in such a manner to prevent vendee's performance, they cannot claim a default until they have afforded the vendee a reasonable opportunity to perform).

Because Coddon's delay of a single installment payment was not default under the contract, Youngkrantz's attempted statutory cancellation was ineffective.

---

5. The notice also relied on unpaid daily interest of $.14 per day. Daily interest was not a term of the written contract, and failure to pay this minimal sum fully was not a material breach or substantial failure of performance.

## II.

Even if late payment were to constitute default under the contract, the district court's ruling that it was without jurisdiction to consider Coddon's equitable claims was error. The trial court ruled:

> The Coddons failed to seek relief prior to the expiration of the 60 day redemption period, thus this court lacks subject matter jurisdiction to reinstate the contract for deed or to continue to restrain Galen Youngkrantz and Patricia Youngkrantz from possessing and occupying the real property and personal property of Country Manor Mobile Home Park.

During the 60–day redemption period, the statute allows a vendee to

> secure from a * * * district court an order that the termination of the contract be suspended until your claims or defenses are finally disposed of by trial * * *.

Minn.Stat. § 559.21, subd. 3(b) (1996). However, judicial intervention is only one option of a vendee; the other is to cure default, as Coddon had substantially done. *Id.* Under these circumstances, application of the statute should not exclude equitable relief.[6]

We held in *O'Meara v. Olson*, 414 N.W.2d 563, 564 (Minn.App.1987), that the statutory cancellation provisions of Minn.Stat. § 559.21 did not preempt judicial cancellation or other remedies available to purchasers or vendors of real estate. *Id.* at 567–68. We also recognized that strict application of statutory cancellation could be unjust.

> If the theory of the appellants were followed, a full hearing on the merits in open court subject to appellate review would be preempted by summary, non-judicial cancellation enforced by the vendor. This would thwart the purpose of the statute—protection of vendees—and lead to an absurd result.

*Id.* at 567. We have rejected the argument that equity is powerless to interfere with the vested cancellation rights of a contract vendor:

> However drastic the statutory procedure, it cannot be that the legislature intended equity to be entirely powerless and deprived of all its former beneficent jurisdiction in such matters * * *.
>
> * * * It is because we are confident that the legislature did not intend such complete tying of hands of equity that we are using its power here.

*D.J. Enterprises of Garrison, Inc. v. Blue Viking, Inc.*, 352 N.W.2d 120, 121–22 (Minn. App.1984), *review denied* (Minn. Oct. 11, 1984) (quoting *Follingstad v. Syverson*, 160 Minn. 307, 311–12, 200 N.W. 90, 92 (1924)).

While we acknowledge those cases that refused to apply equity to statutory cancellations, the circumstances of this case justify equity's "beneficent jurisdiction." Coddon attempted to perform by mailing his monthly payments according to the parties' custom. Youngkrantz's acts of returning and refusing payments appear to be an attempt to force a default. The result of statutory cancellation would be Coddon's loss of $40,000 in equity and the loss of $60,000 in capital improvements.[7]

We reverse the trial court's judgment and remand this case to the trial court to reinstate the contract and exercise its equity jurisdiction.[8]

## DECISION

The district court erred by ruling that Coddon's delay in making a single installment payment was a default that justified cancellation of the parties' contract for deed. Further, the district court erred by ruling

---

**6.** The trial court ruled that Coddon waived and was estopped from claiming any defense of waiver based on Youngkrantz's acceptance of partial payment and based this ruling on a March 18, 1995, letter from Coddon to Youngkrantz. Our review of this letter, which is unrelated to this cancellation proceeding, does not support the trial court's ruling. Further, Youngkrantz's acceptance of the June and July payments was more than waiver. It was acceptance of pay-

ments under the contract that satisfied Coddon's performance.

**7.** Based on unrefuted testimony of Coddon.

**8.** Because we reverse the judgment, we do not decide whether Steve Coddon was personally liable to respondents.

that it lacked jurisdiction to consider Coddon's equitable claims.

**Reversed and remanded.**