United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 97-3432

| | |
|---|---|
| Opus Corporation, | * |
| a Minnesota corporation, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| International Business Machines | * |
| Corporation, a New York corporation, | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted:  March 12, 1998
Filed: April 20, 1998

_____

Before BEAM and HEANEY, Circuit Judges, and KOPF,[1] District Judge.

_____

KOPF, District Judge.

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

Opus Corporation (Opus) appeals from the district court's[2] decision to grant summary judgment in favor of International Business Machines Corporation (IBM).

---

[2]The Honorable Michael J. Davis, United States District Judge, adopting the report and recommendation of the Honorable Raymond L. Erickson, United States Magistrate Judge.

Opus presents two issues on appeal: (1) Did the district court err when it construed "all recourse obligations" to mean secondary obligations, and (2) Did the district court err in granting summary judgment on Opus's claim that IBM breached its fiduciary duty as managing partner? After careful consideration, we conclude that the district court's decision was correct and we affirm.

## I. Background

Because we have the benefit of two thoughtful and thorough opinions by the district court,[3] the background of this matter will be stated summarily. In essence, this is a breach of contract case involving a limited partnership agreement. The parties to the limited partnership agreement are Opus and IBM. It is undisputed that Minnesota law applies.

## A. The Recourse Issue

The purpose of the limited partnership was to construct and rent a 50-floor office building known as "First Bank Place." The partners intended to erect a prominent office building in downtown Minneapolis. Opus was the sole limited partner with a 10-percent partnership interest. IBM was the sole general partner with a 90-percent interest. At its inception, the partnership was thinly capitalized; that is, IBM contributed only $90,000 of capital and Opus contributed $10,000.

Both Opus and IBM agreed to do a variety of things to accomplish the goal of building and developing "First Bank Place." For example, IBM agreed to raise the large sums of money needed to construct what was intended to be a fancy building.

---

[3]Magistrate Judge Erickson authored a 77-page report and recommendation, and Judge Davis wrote a 24-page opinion adopting the report and recommendation.

IBM also agreed to rent 275,000 square feet of space in the new building for an agreed price.

As for financing, IBM guaranteed full payment by the partnership of the principal and interest on more than $325 million to be used for construction. IBM also guaranteed that the partnership would complete construction of the building. Regarding this completion guaranty, Opus agreed to indemnify IBM to the extent of one-third of IBM's liability if the partnership failed to complete construction and IBM was called to honor its guaranty of completion.

For its part, Opus became the general contractor and leasing agent for the project. An Opus affiliate became the property manager. Opus hoped to make millions of dollars from these separate roles. Neither IBM nor the partnership had any right to these earnings.

In a letter of intent, Opus agreed with IBM that, as consideration for the benefits Opus was deriving from the deal, Opus would take over other leases from a prospective "anchor tenant" so the tenant could move into the new building. The prospective tenant was First Bank. As a result, Opus entered separate negotiations with First Bank. In the end, Opus agreed with First Bank that Opus would take over First Bank's other leases so First Bank could move into the new building. Opus hoped to make as much as $38 million by subleasing First Bank's old space. Everyone agrees that neither IBM nor the partnership would have shared in that profit.

No agreement between IBM and Opus imposed upon IBM or the partnership any liability--direct or indirect--for the First Bank leases Opus took over. However, to give Opus a tax break, after Opus completed its negotiations with First Bank, some payments made by Opus to First Bank were funneled through the partnership.

In their capacities as partners, IBM and Opus understood there might be a need for additional partnership capital in the future. Thus, they agreed that under certain circumstances the general partner, IBM, could "call" for the partners to contribute more money. If a partner, like Opus, failed to contribute its share of additional capital, IBM could "cram down"; that is, IBM could pay the capital Opus failed to pay, and take over Opus's interest in the partnership.

If the "cram down" took place, the parties agreed that "the Contributing Partner shall (x) assume and indemnify the Non-Contributing Partner and its affiliate(s) against <u>all recourse obligations of the Non-Contributing partner . . . in connection with Partnership business</u> . . . ." (Art. 3.2(f) Amended and Restated Limited Partnership Agreement; Opus App. at 342-43.) Specifically listed as "recourse obligations" were IBM's guaranty of construction financing, IBM's guaranty of completion, Opus's indemnity agreement with IBM regarding IBM's completion guaranty, and "any other recourse obligation on third-party loans." (<u>Id.</u>) Opus's agreements with First Bank were not described as "recourse obligations."

As the perceptive reader might predict, the real estate market in Minneapolis collapsed, IBM made a capital call,[4] Opus refused to meet the call, and IBM "crammed down" on Opus. Opus then made a demand on IBM to reimburse Opus for the money it had paid First Bank regarding the leases on the old First Bank space.

Noting that it had lost over $80 million on the project and that it continued to be obligated to pay rent on 275,000 square feet of space at higher than market rates, IBM refused to honor Opus's indemnity demand. IBM asserted that Opus's payments to First Bank were not "recourse obligations of the Non-Contributing partner in connection with Partnership business."

## B. The Fiduciary Duty Issue

---

[4]IBM called for $4,718,600. Opus's share was $471,868.

Opus argues that IBM, in its capacity as general partner, breached its fiduciary duty to Opus. Opus's original claim was based on a conspiracy allegation. In its amended complaint, Opus asserted that:

> At some time unknown to Opus, either before or shortly after the parties entered into the Partnership Agreement, IBM conspired with the parties and its affiliated corporations and undertook a series of covert actions that were designed to eliminate Opus as a partner and damage or defeat Opus' partnership interest.

(Am. Compl. ¶ 7; Opus Addendum to Br. at 58.)

After the motion for summary judgment was filed, Opus essentially abandoned its conspiracy claim. Instead, Opus defended the motion for summary judgment by contending that various acts or omissions of IBM constituted a breach of fiduciary duty.

It is undisputed that both Opus and IBM are very sophisticated companies. IBM, of course, is well known. While not as famous as IBM, Opus is a knowledgeable real estate developer. In fact, one commentator described Opus as "on its way to becoming Minneapolis' king of office development." (Patrick Boulay, Opus Eyes the Crown, FREEWAY NEWS (June 15, 1988; IBM App. at 992-93.) Each company hoped to earn millions of dollars from their association.

The two sophisticated parties engaged equally sophisticated negotiators and lawyers to help them agree on each of the many questions raised by the formation of the partnership and the related business ventures. In fact, it took over a year to arrive at a final draft of the partnership agreement. When the partners eventually signed it, the agreement was 94 pages long. It also contained numerous explanatory exhibits.

Among many other things, the partners agreed that IBM would generally have no liability to Opus if IBM made "mistake[s] in judgment." (Art. 5.9 Amended and Restated Limited Partnership Agreement; Opus App. at 375-76.) In particular, they agreed that IBM would have no liability to Opus for mistakes in judgment unless IBM intentionally violated the agreement, was "grossly negligent," or engaged in "willful neglect." (Id.) Specifically, the partners agreed that the following "business judgment" rule would govern them:

> The Managing General Partner and the Partners shall perform their duties under this Agreement with ordinary prudence and in a manner characteristic of business persons in similar circumstances. However, neither the Managing General Partner nor any other Partner shall have any liability whatsoever to the Partnership or to any Partner for loss caused by any act or by the failure to do any act if the loss suffered by the Partnership or such Partner arises out of a mistake in judgment by the Managing General Partner or such Partner, as the case may be or if the Managing General Partner or such Partner, as the case may be, in good faith, determined that the action giving rise to the loss was in the best interests of the Partnership; provided, however, that such exculpation from liability shall not apply to any intentional violation of the terms and provisions of this Agreement, nor shall it apply to any liability for loss caused by any act or by the failure to do any act which arises out of the gross negligence or willful neglect of the Managing General Partner or such Partner, as the case may be.

(Id.)

## II. Discussion

We first examine the district court's decision that summary judgment should be granted for IBM because Opus's obligations to First Bank were not "recourse obligations of the Non-Contributing partner [Opus] in connection with Partnership business." We then examine the district court's decision that summary judgment should be granted in favor of IBM on Opus's breach of fiduciary duty claim.

## A. Standard of Review

In reviewing the district court's decision to grant summary judgment, we follow well-known rules. We have previously described those rules this way:

> In reviewing a district court's grant of summary judgment, this court applies the same standard as the district court applied, without giving deference to the court below. Osborn v. E.F. Hutton & Co., 853 F.2d 616, 618 (8th Cir.1988). A court should grant a summary judgment motion if the full record discloses that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Osborn, 853 F.2d at 618. The non-moving party must establish significant probative evidence to prevent summary judgment. Id. In addition, the court must give the benefit of all favorable factual inferences to the party opposing summary judgment. Simmons v. Diamond Shamrock Corp., 844 F.2d 517, 519 (8th Cir.1988). In a trilogy of cases, the Supreme Court established that the Rule 56 motion should be interpreted to accomplish its purpose of disposing of factually unsupported claims. Also, the trial judge's function is not to weigh the evidence and determine the truth of the matter, but rather, the judge must determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir. 1990). (Beam, J.)

We emphasize that summary judgment is prohibited only when material facts are genuinely in dispute. The Supreme Court has said:

[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

fact . . . . Only disputes over facts that might affect the outcome of the
suit under the governing law will properly preclude the entry of summary
judgment.

Anderson, 477 U.S. at 247-48.

## B. The Meaning of "Recourse"

The district court believed the words "recourse obligation," in the context of article 3.2(f) of the partnership agreement, meant an obligation secondarily owed by a partner because of the partnership's primary liability to pay the obligation. Since the partnership was never obligated to pay the First Bank leases, the district court held that such obligations were not "recourse obligations" of Opus. Rather, the First Bank liabilities were direct obligations of Opus to First Bank. As a result, the indemnity provision of article 3.2(f) did not apply.

The district court reached this conclusion by applying three Minnesota principles of construction. We agree with the district court that the following principles of law apply. First, the construction and effect of an agreement raise questions of law. Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66 (Minn. 1979).[5] Second, "the fundamental approach . . . is to allow the intent of the parties to prevail." Id. Finally, courts must avoid an interpretation that would render a provision meaningless. Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 526 (Minn. 1990).

---

[5]The court held that the contract was not ambiguous because the language was not reasonably susceptible to more than one construction. See, e.g., In Re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 498 (Minn. 1995). Whether a contract is ambiguous presents a question of law, and normally the court must resolve that question without resort to extrinsic evidence. Id. We agree that the provision at issue is not ambiguous.

The district court had many reasons for its decision. Those reasons can be summarized as follows: (1) some dictionary definitions supported the court's construction; (2) Opus's construction of the words would render a term superfluous; (3) the agreement gave examples of recourse obligations and Opus's obligations to First Bank did not fit those examples; and (4) Opus's construction of the words would create the bizarre result that Opus could ignore a capital call yet be indemnified for all expenses (from postage to legal bills) associated with the business of the partnership.

**1.**

Opus argues that the district court's construction is too narrow. Instead, Opus insists the words "recourse obligation" of a partner really mean "any obligation" of a partner if it is "in connection with the Partnership business." Opus asserts that it would not have entered the partnership if it had known it could suffer a "cram down" and still have to pay First Bank.

We disagree with Opus for all the reasons carefully articulated by the district court. Two points in particular persuade us that Opus's arguments are without merit.

Initially, under Minnesota law we are obligated to avoid a contract interpretation that would render a provision of the contract meaningless. Chergosky, 463 N.W.2d at 526 ("Because of the presumption that the parties intended the language used to have effect, we will attempt to avoid an interpretation of the contract that would render a provision meaningless.") See also Santillan v. Martine, 560 N.W.2d 749, 751 n.1 (Minn. App. 1997); Carlson Real Estate Co. v. Soltan, 549 N.W.2d 376, 379 (Minn. App. 1996). Consequently, we must attempt to give meaning to the word "recourse"; Minnesota law does not permit us to ignore the word.

If we assume that "recourse" has a meaning, then it is evident that "recourse" limits the reach of the word "obligations." In other words, IBM does not have a

responsibility to indemnify Opus for "obligations"; IBM has a responsibility to indemnify Opus for "<u>recourse</u> obligations." Interpreting "recourse obligations" to mean "any obligations," and not solely those obligations flowing from the partnership to a partner, makes the word "recourse" superfluous.

Secondly, the partnership agreement specifically lists examples of the types of obligations considered "recourse." For example, listed as a "recourse obligation" was IBM's completion guaranty and Opus's indemnity agreement with IBM regarding that guaranty.

These examples describe situations where liability flows from the partnership, as the primary obligor, to the partner, as the secondarily liable party. In these situations the partner has no liability unless the partnership first negotiates and incurs a liability. As a result, obligations that are direct, like Opus's obligations to First Bank, are not a "<u>recourse</u> obligations" contemplated by the indemnity provision of the partnership agreement.

**2.**

Opus tries to avoid the force of the district court's reasoning by making numerous arguments. While we compliment Opus for the quality of its advocacy, we reject each of those arguments. In fact, we find it unnecessary to engage in an extended discussion of them. However, four of Opus's arguments warrant a brief response.

Opus argues case law and dictionary definitions can be found that in the abstract support its construction of the word "recourse." While we do not dispute Opus's assertion, it is not persuasive. The question here is the meaning of the word "recourse" in a particular section of a particular partnership agreement. We are not moved by definitions wrenched from one context and grafted onto another. <u>See, e.g.</u>, <u>Republic Nat'l Ins. Co. v. Lorraine Realty Corp.</u>, 279 N.W.2d 349, 354 (Minn. 1979) ("Intent

is 'ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given meaning in accordance with the obvious purpose of the . . . contract as a whole.'" (quoting Cement, Sand & Gravel Co. v. Agricultural Ins. Co., 225 Minn. 211, 216, 30 N.W.2d 341, 345 (Minn. 1947))).

Opus also contends that the listed examples of "recourse" obligations in the partnership agreement are really "direct" obligations. Opus claims that some IBM guarantees issued to third parties characterized those obligations as "direct" obligations to the creditors. Hence, Opus argues that the First Bank obligations are just like the IBM guarantees. This argument fails to recognize, however, that in the guaranty situation the partner has no liability to the creditor unless the partnership first negotiates and incurs liability to the creditor. This is not true with Opus's obligations to First Bank.

In addition, Opus asserts that the "First Bank West" agreement directly obligated the partnership to First Bank.[6] Thus, Opus argues that the indemnity provision ought to apply to all the First Bank agreements because the district court's interpretation of the word "recourse" is inconsistent with the structure of the "First Bank West" agreement. In other words, Opus argues that the partnership was primarily liable to First Bank at least insofar as the "First Bank West" situation was concerned, and, as a result, "recourse" cannot mean what the district court said it did. We disagree.

After Opus completed its separate negotiations with First Bank, and to give Opus a tax advantage, the partnership, at Opus's request, agreed to act as a conduit for payments to First Bank on the "First Bank West" obligations. Accordingly, the partnership and First Bank executed a "reimbursement agreement" pursuant to which

_____

[6]Opus admits IBM was not a party to the other agreements with First Bank.

-13-

the partnership paid First Bank $1,526,762.  This payment was made to First Bank to reimburse First Bank for up to one-half the cost of buying out the bank's leases in

"First Bank West." The partnership agreement, in turn, provided that Opus would make an equal cash contribution to the partnership so the partnership could pay First Bank.

The structure of the "First Bank West" deal does not change the fundamental character of the relationship between First Bank and Opus. Opus expected to and did deal separately and directly with First Bank. Without IBM, Opus and First Bank made their own deal, a deal that included "First Bank West." Moreover, if profits were to be made from Opus's agreement with First Bank, Opus had no responsibility to share them with IBM. The accommodation to Opus by the partnership, wherein the partnership served as a conduit for a payment to First Bank, does not alter the reality of Opus's direct relationship with First Bank. Accordingly, the "First Bank West" transaction is consistent with the district court's interpretation of the word "recourse."

Opus further argues that the testimony of various Opus representatives demonstrates that Opus and IBM intended article 3.2(f) to apply to Opus's obligations to First Bank. There is a simple answer to this assertion. When the language in an agreement is unambiguous, there is no normally no need to use parole evidence. See In Re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d at 498 (stating "[t]he court generally does not consider extrinsic evidence when determining contractual ambiguity"). Parole evidence was unnecessary because the terms of the agreement were not ambiguous.[7]

In summary, the district court's interpretation of article 3.2(f) was correct; that is, article 3.2(f) means that an obligation secondarily owed by a partner because of the partnership's primary liability to pay the obligation is the subject of indemnification if there is a "cram down." Therefore, IBM had no obligation to indemnify Opus for the First Bank obligations since those obligations were direct obligations for which the

---

[7]We also believe the evidence fails to prove Opus's claim that both Opus and IBM originally understood article 3.2(f) encompassed Opus's obligations to First Bank.

-15-

partnership had no liability. As a result, the district court's decision to grant summary judgment to IBM will be affirmed.

## C. Fiduciary Duty

The business judgment rule adopted by the parties is the "prism" through which the breach of fiduciary duty claim must be judged. Washington Bancorporation v. Said, 812 F. Supp. 1256, 1267-71 (D. D.C. 1993) (applying the "business judgment rule" for purposes of summary judgment regarding gross negligence and breach of fiduciary duty claims asserted against bank directors and stating the plaintiff's allegations "did not overcome the presumption inherent in the business judgment rule" (quoting Anderson, 477 U.S. at 247-48)). See also Bane v. Ferguson, 890 F.2d 11, 14 (7th Cir. 1989) (where a partnership was forced to dissolve, causing a termination in the retirement benefits of a retired partner, dismissal of fiduciary duty claim would alternatively be upheld under the "business judgment rule"). (Posner, J.) When we look through the "business judgment" prism, it is apparent no reasonable finder of fact could conclude that IBM breached its fiduciary duty as a general partner.

## 1.

Before turning to Opus's specific arguments, we address two general issues. Opus claims the business judgment rule is irrelevant to a fiduciary duty claim under Minnesota law. Opus further asserts, at least in its complaint, that "either before or shortly after the parties entered into the Partnership Agreement, IBM conspired with the parties and its affiliated corporations and undertook a series of covert actions that were designed to eliminate Opus as a partner and damage or defeat Opus' partnership interest."

We disagree that the "business judgment" rule is irrelevant under Minnesota law. Minnesota law grants equally sophisticated partners the right to place in their equally

sophisticated limited partnership agreement a "business judgment rule" that defines the context against which the ever-present fiduciary duty of the partners will be judged. See, e.g., Minn. Stat. 322A.33 (a general partner of a limited partnership "has the rights and powers and is subject to the restrictions" of "the partnership agreement" and the statutes); Minn. Stat. § 323.17 (stating the "rights and duties of the partners in relationship to the partnership" are "subject to any agreement between them"); Appletree Square I v. Investmark, Inc., 494 N.W.2d 889, 893 (Minn. App. 1993) (stating while partners are not free to destroy the fiduciary character of a partnership, "[p]artners may change their common law and statutory duties by incorporating such changes in their partnership agreement"); Midland Nat'l Bank v. Perranoski, 299 N.W.2d 404, 412-13 & n.10 (Minn. 1980) (stating for partnerships the "fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed" and holding that experienced investor-partners are presumed to have read their partnership agreement). See also Cmt., Elisa Feldman, Your Partner's Keeper: The Duty of Good Faith and Fair Dealing Under the Revised Uniform Partnership Act, 48 SMU L. Rev. 1931, 1955-56 (1995) (collecting and discussing cases that apply the business judgment rule to partnerships).[8]

In addition, we find no evidence that would permit a reasonable finder of fact to conclude IBM "conspired" with anyone to harm Opus. In fact, we note that when one of IBM's consultants suggested Opus be removed as a leasing manager, IBM refused. The absence of such evidence explains why Opus tacitly elected to drop the conspiracy claim alleged in its complaint when it was confronted with IBM's motion for summary judgment. Instead of relying on the conspiracy theory, Opus pursued a strategy of attacking other alleged acts or omissions of IBM alone. We now turn to those additional arguments.

---

[8]We do not wish to be misunderstood. The "business judgment rule" adopted by the parties does not eliminate IBM's fiduciary duties. The rule does, however, provide a contractually stipulated backdrop against which IBM's actions are appropriately judged.

## 2.

Opus claims IBM breached its fiduciary duty because: (1) IBM mismanaged the project; (2) IBM engaged in "self-dealing"; (3) IBM failed to disclose material partnership information; and (4) IBM used "abrasive and intimidating tactics." For all the reasons set forth in the detailed opinions of the district court, we agree that summary judgment was appropriately granted on these claims. Again, while a few observations are in order, a detailed discussion of the issues is unnecessary.

It must be remembered that Opus was not merely a limited partner. On the contrary, Opus was the general contractor and leasing agent, and one of its affiliates was the property manager. In these separate capacities, IBM owed Opus no fiduciary duty as a partner. Moreover, in these capacities Opus admittedly had access to vast amounts of information. In fact, Opus sometimes had information needed by IBM. Still further, because of these roles, Opus participated in many important decisions regarding the project. We stress, therefore, that this case does not present a situation where an "absentee limited partner" with almost no way to inform and protect itself is allegedly subjected to overreaching by a general partner. That said, we briefly discuss Opus's claims.

With regard to the "mismanagement claim," Opus fell far short in presenting evidence that IBM was "grossly negligent," and "gross negligence" was the standard the partners picked when they wrote the "business judgment rule." For example, the employment of allegedly inexperienced people, or the alleged failure to reduce rents, or the claimed failure to secure a long-term lender, or the alleged desire to erect an overly fancy building do not amount to gross negligence when, as here, it is undisputed that IBM devoted vast amounts of time, talent, and money to the project. See, e.g., High v. Supreme Lodge of the World, 214 Minn. 164, 170, 7 N.W.2d 675, 679 (Minn. 1943) (stating gross negligence is "[n]egligence of the highest degree"). Perhaps IBM made mistakes, but no reasonable finder of fact could decide it was grossly negligent.

Regarding the "self-dealing" claim, there is nothing but speculation to support it. Given the staggering losses sustained by IBM, Opus cannot show that IBM deprived it of a "benefit" or "profit," and such a showing is critical to that claim. See, e.g., Minn. Stat. § 323.20 (stating a partner is accountable as a "fiduciary" for "benefits" and "profits" belonging to the partnership).

Opus claims IBM did not give it "material" information, thus breaching its fiduciary duty of disclosure. See, e.g., Appletree Square I. v. Investmark, Inc., 494 N.W.2d at 892-93 (failure of general partners who sold building to limited partners to disclose presence and danger of asbestos amounted to breach of fiduciary duty precluding summary judgment (citing Minn. Stat. § 322.28(2))). We assume, as Opus claims, that IBM failed to give Opus information such as internal financial documents and information concerning IBM's dealings with two consultants. Nevertheless, this information showed what Opus already knew; that is, the documents revealed that the partnership was going to need more money and Opus was obligated to provide capital if a call for capital was made. Simply stated, the information was not "material" as a matter of law because there was no showing that Opus would have done anything differently had it possessed information that only confirmed what it knew as an active participant in the project. Accordingly, no breach of a fiduciary duty can arise from a partner's failure to provide information that was not "material."

Finally, Opus claims IBM employees engaged in "abrasive and intimidating tactics" that breached IBM's fiduciary duty to Opus. For example, Opus points out that an IBM employee "read the riot act" to Opus's chief executive. We assume that where one partner is weak and the other is strong, "abrasive and intimidating tactics" may breach a fiduciary duty. See Evans v. Blesi, 345 N.W.2d 775, 778-80 (Minn. App. 1984) (holding that a "partner" in a closely held corporation breached his fiduciary duty to the other "partner" by the tactics he used to obtain control of the corporation; "partner" shouted, slammed the door, and threatened to dissolve the corporation; the abused "partner" suffered from "high blood pressure, very high anxiety and tremors in

-19-

his hands"). However, because of Opus's significant strength, experience, and knowledge, no reasonable finder of fact could conclude that the tactics employed by IBM amounted to a breach of fiduciary duty under Minnesota law.

## III. Conclusion

In painstaking detail, the district court considered IBM's motion for summary judgment and Opus's defense to the motion. After carefully reviewing both the facts and the law, and giving Opus the inferences due it, we are convinced that the district court correctly granted summary judgment. Accordingly, the district court's decision granting summary judgment in favor of IBM is affirmed.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.